Matter of The **NEW HAVEN CLOCK &
WATCH COMPANY**, Debtor.

The **FIRST NATIONAL BANK OF CHI-
CAGO**, Petitioner-Appellee-Appellant,

v.

**Arthur B. O'KEEFE, Jr., Trustee,**
Appellant,
and
The **United States of America, Appellant.**

No. 158, Docket 24767.

United States Court of Appeals
Second Circuit.

Argued Jan. 15, 1958.

Decided March 28, 1958.

Schwartz & Knight, New Haven, Conn. (J. Stephen Knight, New Haven, Conn., of counsel, and Charles D. Issac, on the brief, New Haven, Conn.), for petitioner-appellee-appellant.

Curtiss K. Thompson, New Haven, Conn., for appellant Arthur B. O'Keefe, Jr., Trustee.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attorneys, Washington, D. C. (Marvin W. Weinstein, Department of Justice, Washington, D. C., Attorney, of counsel), Simon S. Cohen, U. S. Atty., for District of Connecticut, Hartford, Conn., and W. Paul Flynn, Asst. U. S. Atty., New Haven, Conn., for appellant United States of America.

Before MEDINA and MOORE, Circuit Judges, and GALSTON, District Judge.

MEDINA, Circuit Judge.

The New Haven Clock & Watch Company, a debtor which on December 7, 1956 filed a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., had, since 1947, been borrowing large sums of money from The First National Bank of Chicago. This debt was secured by the assignment to the Bank of accounts receivable owing to the Clock Company. The principal issues on this appeal from the order below directing the Trustee to pay to the Bank the amount of the Clock Company's debt involve the validity and priority of the Bank's security upheld by the court below, under the financing arrangement used by the Bank in lending large sums to the Clock Company.

The United States, a substantial creditor of the Clock Company, asserts that the assignment of the accounts receivable to the Bank was fraudulent in law because the Clock Company allegedly reserved the right to dispose of the proceeds of the accounts, and thus the transfers to the Bank were void under

Section 70, sub. e of the Bankruptcy Act.[1] The principle that the "reservation of dominion" by the debtor over property transferred to secure a loan voids the creditor's security interest in that property was applied by the Supreme Court to financing by the assignment of accounts receivable in Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 569, 69 L.Ed. 991.

It is against the rule set forth by the Supreme Court in Benedict v. Ratner, requiring the creditor so to "police" the assigned accounts that the debtor does not reserve dominion over them, that we must test the validity of the Bank's security. Assuming *arguendo*, as the Government contends, that this rule is applicable to every security transaction involving the assignment of accounts regardless of state law relating specifically to such assignments, it is nevertheless clear that, since, in the case at bar, the Bank effectively "policed" the receivables assigned to it, the transfers to the Bank were not fraudulent and thus not void under the Bankruptcy Act.

The financing agreement entered into by the Bank and the Clock Company, and the control over the assigned accounts exercised by the Bank acting pursuant thereto, are readily distinguishable from the security transaction involved in Benedict v. Ratner. In that case the only tangible evidence of the assignment was a list of the assigned accounts sent by the debtor to the creditor. Although the creditor was given the right to demand that these accounts be used in repayment of the loan, he did not do so, but rather "the company (debtor) was not required to apply any of the collections to the repayment of (the) loan. It was not required to replace accounts collected by other collateral of equal value. It was not required to account in any way to (the creditor). It was at liberty to use the proceeds of all accounts collected as it might see fit. * * * The business was to be conducted as (before the loan had been negotiated). Indebtedness was to be incurred, as usual, for the purchase of merchandise and otherwise in the ordinary course of business." 268 U.S. at page 360, 45 S.Ct. at page 567. Thus, the security transaction in Benedict v. Ratner was an assignment of accounts in name only, while, in the case at bar, the actual conduct of the Bank in controlling the receivables assigned to it was the precise opposite of what occurred in Benedict v. Ratner, and shows beyond doubt that the debtor did not, in fact, reserve dominion over the assigned accounts.

It was the practice of the Bank to lend to the Clock Company in exchange for demand collateral notes in the amount of each loan no more than seventy-five per cent of the face amount of the accounts assigned to it to secure the loan, and this ratio of debt to collateral was continuously maintained by the Bank in its dealings with the Clock Company. Along with each schedule of accounts assigned to the Bank there was an assignment contract which obligated the Clock Company to: (1) transmit to the Bank all proceeds received on the assigned accounts, so endorsed that the Bank could collect on them; (2) keep the proceeds of the assigned accounts separate from its own funds and expressly in trust for the Bank; (3) record on all of its pertinent records and books of account a notation showing that these accounts were assigned; (4) allow the Bank to examine and make extracts from its records; (5) notify the Bank immediately in case of the return of merchandise by the debtor of an assigned account, segregate and label the returned goods, and within ten days forward new accounts to cover the value of the returns. The assignment contract also provided that all funds col-

1. Bankruptcy Act § 70, sub. e (1), 11 U.S. C.A. § 110, sub. e (1):
   "A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."

lected or received by the Bank from the debtors of the assigned receivables were to be deposited in a special account in the Bank. This account was to be held by the Bank as collateral security for the payment of any indebtedness to it, and the Clock Company had no control over, nor could it withdraw any money from this account.

This special collateral account was opened and maintained by the Bank as provided in the agreement, and most of the other provisions of the assignment contract were also carried out by the parties. In addition, the Bank, acting pursuant to another provision in the contract, appointed an employee of the Clock Company as its special agent, who received in its behalf all payments from the debtors of assigned accounts and transmitted them to the Bank, and this employee was subject exclusively to orders from the Bank in the handling of these receipts.

Additional evidence of the exercise by the Bank of control over the assigned receivables is afforded by other records of these assignments kept up to date by the Clock Company. For each account assigned the Clock Company prepared an electronic punch card and an invoice in duplicate. Each of these invoices was stamped on the back directing the account debtor to pay the amount due thereon to the Bank, without inquiry, in full satisfaction of the Clock Company's interest in that account. The Clock Company retained one of these stamped invoices along with the electronic punch card for that account and sent the duplicate invoice to the Bank. Thus, in the Clock Company's office, the records of the assigned accounts consisted of the punch cards, the stamped invoices and the customers' ledger card which was stamped to indicate the assignment.

Against this background of the Bank's control and "policing" of the assigned receivables, the Government argues that the Clock Company actually reserved dominion over the accounts because it was allowed by the Bank to substitute new accounts for some of those previously assigned. However, this contention is untenable because the value of these substituted accounts was less than two per cent of the amount of money loaned, and also because there were sound financial reasons for these substitutions. Some assigned accounts had deteriorated in collateral value, and the Bank on at least one occasion notified the Company that if the deterioration of assigned receivables continued the Bank would require a greater ratio of collateral to secure the loans. Fresh accounts were also substituted when an assigned account had become stale or uncollectible, or when the account debtor returned merchandise or received a credit. Likewise, the Government's attack on the security transactions because of the Clock Company's failure to segregate and label returned merchandise is without merit since new receivables were assigned by the Company to cover those accounts against which merchandise had been returned.

Thus, although the Clock Company often substituted, without the Bank's direction, fresh accounts for old ones which had previously been assigned, and the Clock Company's customers' ledger was not always stamped up to date as the Company was required by the terms of the agreement to do, we hold that the continuous maintenance by the Bank of the four-to-three collateral to debt ratio in the form of assigned receivables and/or money in the collateral account, the Bank's hiring of its own agent in the Clock Company to handle and forward to it collections on the assigned accounts, and the keeping of an up-to-date record of the assignments on a set of electronic punch cards and duplicate invoices, all show sufficient "policing" to sustain the validity of the Bank's security interest. In other words, on the basis of the facts in the case at bar there is no ground for the imputation of fraud in the security transaction as there was in Benedict v. Ratner, where, in spite of the assignment of the receivables, business was conduct-

ed, and indebtedness incurred, by the debtor as though the assignment had not been made.

Although the Bank's control over its security interest thus adequately fulfilled the "policing" requirements under the rule of Benedict v. Ratner, an alternative ground for rejecting the Government's argument lies in the obvious validity of the assignments under the applicable and controlling Connecticut statutes,[2] to be discussed later in this opinion. The Supreme Court did not decide Benedict v. Ratner on the basis of general "applicable legal principles," but rather it derived the rule for its decision from an examination of the relevant state cases. See 268 U.S. at page 362, 45 S.Ct. at page 568; also Security Mortgage Co. v. Powers, 278 U.S. 149, 153–154, 49 S.Ct. 84, 73 L.Ed. 236. Nothing could make this more certain than the language of the Court itself:

"The rights of the parties depend primarily upon the law of New York. * * * (I)t is clear that, if the original assignment was a valid one under the law of New York, the Bankruptcy Act did not invalidate the subsequent dealings of the parties." 268 U.S. at page 359, 45 S.Ct. at page 567.

Since there is no doubt that the Clock Company's assignments were valid under Connecticut law, the Bank's security is not void under Section 70, sub. e of the Bankruptcy Act.

The Trustee questions the validity of the assignments by a more involved and devious argument than that urged by the Government. The Trustee argues that, since there is the possibility of an adjudication of bankruptcy in this case, we must test the Bank's security interest against the provisions of Section 67, sub. c(2) of the Bankruptcy Act,[3] and that,

2. Connecticut General Statutes (1949 Rev.):

"Section 6719. Assignment valid when made. An assignment of an account shall transfer from the date of its making all rights which the assignor has power to transfer and shall be valid and fully perfected as of the date it is made (a) if it is in writing; (b) if the assignee has given value therefor; (c) if the assignee takes the assignment in good faith; and (d) whether or not notice of the assignment is given to the account debtor or the account debtor assents to such assignment. After the making of such an assignment no existing or future creditor of the assignor and no subsequent assignee shall acquire any right, title, lien or interest in or to such account, or any proceeds thereof, or any judgment, instrument, token or writing given as evidence thereof or in substitution therefor, equal or superior to or in diminution of the rights of the assignee under such assignment."

"Sec. 6720. Rights of account debtor. Whenever, prior to notice to him of an assignment of an account, the account debtor has, while acting in good faith (a) made payment of the account, in whole or in part; or (b) given a negotiable instrument in payment or as evidence, in whole or in part thereof; or (c) effected a novation in respect thereto; or (d) become liable upon a final judgment thereon, such payment or the assumption or

suffering of such substitute liability shall, to the extent thereof, be a valid discharge of the account debtor's liability upon such account. Nothing in this chapter shall deprive the account debtor of any valid defense to which he would otherwise be entitled or any valid right existing under the contract from which the assigned account arose or of any right of set-off or counterclaim against the assignor existing at the time the account debtor receives notice of the assignment."

3. Bankruptcy Act § 67, sub. c, 11 U.S.C.A. § 107:

"Where not enforced by sale before the filing of a petition initiating a proceeding under this title, and except where the estate of the bankrupt is solvent: (1) though valid against the trustee under subdivision (b) of this section, statutory liens, including liens for taxes or debts owing to the United States or to any State or any subdivision thereof, on personal property not accompanied by possession of such property, and liens, whether statutory or not, of distress for rent shall be postponed in payment to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this title and such liens for wages or for rent shall be restricted in the amount of their payment to the same extent as provided for wages and rent respectively in subdivision (a) of section 104 of this title; and (2) the provisions of subdivision (b)

582

under those provisions, the assignments are not valid against the Trustee.

■ Assuming *arguendo* that we should ignore the fact that the proceeding below involved reorganization and not bankruptcy, we shall now consider the merits of the Trustee's contentions. The Trustee argues that the Bank's security interest was a "statutory lien" within the meaning of Section 67, sub. c(2) and not "fully perfected" within the meaning of the Connecticut General Statutes, § 6719, and hence, the argument runs, the Bank did not have "possession of" the accounts receivable as required by Section 67, sub. c for the validity of "statutory liens" on personal property as against the interest of the Trustee. We think this argument unsound on all points. The Bank's lien on the proceeds of the assigned receivables is not a statutory lien since it did not arise "primarily from an economic relationship defined by the legislature" but rather it arose "from the terms of a contract providing for security." 4 Collier on Bankruptcy (14th ed.) 184; In re Tele-Tone Radio Corp., D.C.D.N.J., 133 F.Supp. 739, 746–748. In other words, the Bank is asserting a consensual common law lien which arose not because of the terms of a statute so providing, but rather as the result of the assignment itself. In addition, and irrespective of the Trustee's contention that the assignments were not "fully perfected" under Connecticut law, even if the Bank's interest were based on a "statutory lien" the Bank had "possession" of the receivables sufficient to satisfy Section 67, sub. c(2), since its agent

collected and transmitted to it all the payments made by the account debtors.

■ Similarly, the Trustee's claim that the assignments were not "fully perfected" prior to notification of the debtors is untenable, since it is contrary to the precise statutory provision that "(a)n assignment of an account * * shall be valid and fully perfected as of the date it is made * * * whether or not notice of the assignment is given to the account debtor * * *." Conn. Gen.Stats. (Rev.1949), § 6719. Although the statement in another part of this section that an otherwise valid assignment "shall transfer from the date of its making all rights which the assignor has power to transfer" may be somewhat inconsistent with the provisions of Section 6720 designating several means other than payment to the assignee by which an account debtor, who was not notified of the assignment, can discharge his liability on the account, we must, in the absence of other Connecticut authority, interpret the statutory provisions in a reasonable manner, consistent with the legislative intent. The reasonable view, which is consistent with the obvious intent of the legislature, is to interpret the statute as providing for valid and "fully perfected" assignments, without notification of the account debtors, and thus without the consequent deleterious effect such notification would have on the borrower's business position. See Corn Exchange Nat. Bank & Trust Co. v. Klauder, 318 U.S. 434, 439–440, 63 S.Ct. 679, 87 L.Ed. 884. Thus the Bank's security interest is valid under Section 67, sub.

of this section to the contrary notwithstanding, statutory liens created or recognized by the laws of any State for debts owing to any person, including any State or any subdivision thereof, on personal property not accompanied by possession of, or by levy upon or by sequestration or distraint of, such property, shall not be valid against the trustee: *Provided, however,* That so much of clause (1) of this subdivision as restricts liens for wages and rent and clause (2) of this subdivision shall not apply in proceedings under chapter 10 of this ti-

tle, unless an order shall be entered therein directing that bankruptcy be proceeded with, or in proceedings under section 205 of this title. The court may on due notice order so much of any lien in excess of the restricted amount under clause (1) of this subdivision and any lien invalid under clause (2) of this subdivision to be preserved for the benefit of the estate and, in any such event, such lien for the excess and such invalid lien, as the case may be, shall pass to the trustee."

c(2) as against the contentions advanced by the Trustee.

The Trustee's further argument that the Bank's interest should, by virtue of Section 67, sub. c(1), be subordinated to the priorities set forth in Section 64 of the Bankruptcy Act rests on the same arguments used in support of his position that the assignments were not valid as against him. Accordingly, for the reasons already stated above we reject this contention of the Trustee as without merit. Likewise, there is nothing in the record to support the Trustee's last argument that the rights of the Bank are subject to modification in the final plan of reorganization. There is no evidence of the existence of any creditor, other than the Bank, with a security interest in the assigned receivables. See also In re Third Avenue Transit Corp., 2 Cir., 198 F.2d 703.

Turning to the Bank's cross-appeal from the refusal of the court below to order the Trustee to pay the Bank reasonable attorney's fees, we must first consider the Government's motion to dismiss this appeal on the ground that the notice of appeal was not filed within the time allowed by Section 25 of the Bankruptcy Act.[4]

The notice of the Bank's appeal was filed thirty-eight days after entry of the order below, and the only question raised by the Government's motion is whether the thirty day or the forty day time limit in Section 25 is applicable. In spite of the fact that, as required by the express provisions of Section 25 for the reduction of the time limit to thirty days, no notice of entry of the judgment was served on the Bank, and no proof of notice was ever filed with the District Court, the United States argues that the Bank was subject to the thirty day time limit because notice of entry of the judgment was mailed to it by the Clerk. This construction of Section 25 is contrary to the plain meaning of the statute, and, in addition, has been considered previously and rejected by this Court. Hammer v. Tuffy, 145 F.2d 447, 451; Siegel v. Margiotta, 102 F.2d 525. Accordingly, the motion to dismiss the Bank's appeal is denied.

Consideration of the merits of the Bank's appeal, however, raises a serious question regarding the completeness of the record on this appeal. The Bank sought an order in the District Court including an award of reasonable attorney's fees because the Clock Company, in the assignment contract, agreed "to reimburse the Bank for any and all legal and other expenses incurred in and about the checking, handling and collection of the accounts hereby assigned to the Bank and the preparation and enforcement of any agreement relating thereto." The Government, in its oral argument before this Court and in its brief, opposed this claim on the ground that the United States, acting pursuant to Sections 3670 and 3671 of the Internal Revenue Code of 1939, and Sections 6321 and 6322 of the Internal Revenue Code of 1954, 26 U.S.C. §§ 6321, 6322, had a tax lien on the proceeds of the assigned accounts which was prior to the "inchoate" lien of the Bank. Since the amount of the Bank's lien for attorney's fees was unknown at the time of the Clock Company's petition for reorganization, this lien was "inchoate" in the sense used to determine its priority as against a United States tax lien. United States v. City of New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520. Thus, the Government's lien is superior to the claim for attorney's fees if the United States has complied with the aforementioned provisions of the Internal Revenue Codes and in addition has filed the notice of the lien as required by Section 3672 of the Inter-

---

4. Bankruptcy Act § 25, sub. a, 11 U.S.C.A. § 48, sub. a:
"Appeals under this title to the United States courts of appeals shall be taken within thirty days after written notice to the aggrieved party of the entry of the judgment, order or decree complained of, proof of which notice shall be filed within five days after service or, if such notice be not served and filed, then within forty days from such entry."

nal Revenue Code of 1939, and Section 6323 of the Internal Revenue Code of 1954, 26 U.S.C. § 6323, to protect the validity of the lien against the claim of a pledgee such as the Bank. The record on appeal, however, is devoid of any evidence concerning the action taken by the Government to perfect its lien, and the opinion below states no reason for the refusal to grant attorney's fees.

Therefore, since we cannot decide the merits of the Bank's appeal because of the incomplete state of the record, this case is remanded to the District Court for determination of the issues of law and fact arising out of the application of the Bank for attorney's fees and the order below is otherwise affirmed.